UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------x
MIROSLAW GORTAT, et al.,

      Plaintiffs,

 -against-

CAPALA BROTHERS, INC., et al.,

      Defendants.
------------------------------------------------x

GLASSER, United States Senior District Judge:

<u>MEMORANDUM AND ORDER</u>
07 CV 3629 (ILG)

## INTRODUCTION

On August 29, 2007, six former construction workers – five foremen and a laborer[1] – filed federal collective action and state class action claims against Capala Brothers, Inc. ("Capala Bros."), and its two shareholder/officers, Robert and Pawel Capala.  They alleged breach of contract, violation of New York State minimum wage laws, and violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.* (2009), and the Portal-to-Portal Act of 1947, 29 U.S.C. § 254(a) (2009).  The defendants filed an answer on October 18, 2007, that included counterclaims for conversion, breach of fiduciary duty, negligence, and tortious interference with contract.[2]  On February 4, 2009, the defendants filed various motions that are the subject of this order:

---

[1] Miroslaw Gortat, Henryk Bienkowski, Grzegorz Drelich, Miroslaw Filipkowski, Artur Lapinski, and Jan Swaltek.  Plaintiff Drelich is no longer a plaintiff in this action.  <u>See</u> *infra*.

[2] In a Memorandum and Order dated November 12, 2008, <u>see</u> 585 F. Supp. 2d 372 (E.D.N.Y. 2008) (Glasser, J.), the Court dismissed with prejudice the breach of fiduciary duty and negligence counterclaims and dismissed with leave to amend the claim for tortious interference.  The defendants have since repled the tortious interference counterclaim and have appealed the dismissal of the two other counterclaims.  All discovery in the case has concluded save for discovery relating to the amended tortious interference counterclaim.

(1)     motion for summary judgment on the plaintiffs' claim that they worked more hours than they were compensated for in violation of the FLSA and Portal-to-Portal Acts;

(2)     motion to dismiss the class action claims because the plaintiffs are not sufficiently numerous and do not adequately represent the class;

(3)     motion to dismiss the claim for attorney's fees pursuant to New York Labor Law § 198, as that statute has been preempted by federal law;

(4)     motion to strike the plaintiffs' reply to the defendants' first counterclaim for conversion because the reply was not timely;

(5)     motion for summary judgment on the claim that the plaintiffs received compensation below the minimum wage established by the FLSA and New York minimum wage laws;

(6)     motion to amend the case caption because plaintiff Grzegorz Drelich has withdrawn from the case;

(7)     motion for leave to amend the counterclaims to include claim for indemnification and contribution liability against the plaintiff foremen;

(8)     motion to compel two of the plaintiffs and one non-party witness to consent to the New York State Department of Labor's release of their unemployment insurance applications; and

(9)     motion to dismiss the causes of action against the individual defendants Robert and Pawel Capala on the basis that the complaint fails to state a claim against them on the theory of piercing the corporate veil.

In response to these motions, the plaintiffs have filed a cross-motion for partial summary judgment on two issues:

1)     motion for summary judgment on the issue of Robert and Pawel Capala's liability as employers under the FLSA and New York Labor Law; and

2)     motion for summary judgment dismissing the defendants' first counterclaim against plaintiff Lapinski for conversion of a logbook.

The plaintiffs have conceded their claim that they received less than minimum wage in violation of federal and state law, see Plaintiffs' Memorandum of Law ("Pl. Mem."), dated Feb. 13, 2009, at 17, and the plaintiffs do not oppose the motion to amend the

2

caption.  Those motions are granted.  The motion to compel two of the plaintiffs and one witness to consent to release their unemployment insurance applications is denied as moot.[3]  The remaining motions will be considered in turn.

## FACTS

The plaintiffs in this case, construction foremen and laborers, contend that they were not compensated by their employer, Capala Bros., for the full amount of time that they worked.  The plaintiff laborers assert that they worked from 7:00 a.m. until 4:00 p.m. every day, less 30 minutes for lunch, and the plaintiff foremen assert that they worked from 7:00 a.m. until approximately 5:30 p.m. everyday, less 30 minutes for lunch.  Rather than receiving compensation for working eight and a half hours and ten hours respectively, they were each paid for working eight hours per day – from 7:30 a.m. until 4:00 p.m., less 30 minutes for lunch.  The plaintiffs now seek payment for the claimed hours of work for which they were never compensated.

In support of these claims, the plaintiffs proffer the depositions and affidavits of the plaintiffs and non-party witnesses who testify that the defendants required all of their employees to arrive at the defendants' shop in the Greenpoint neighborhood of Brooklyn, New York, at 7:00 a.m. where they would load the defendants' cargo vans with construction materials and tools.  Plaintiffs' Local Rule 56.1 Statement ("Pl. 56.1 Statement"), dated Feb. 13, 2009, ¶ 6. After receiving their work assignments from Robert Capala or, on infrequent occasions, from Pawel Capala, the foremen and laborers would drive from the Greenpoint shop to work sites located in Manhattan.  Id. ¶ 12.  On

---

[3] This motion is moot following the January 29, 2009, order of the Magistrate Judge that required the plaintiffs to give their consent to release these documents.

the way to the work sites, the vans would often make short stops to purchase construction supplies and to allow the workers to get coffee or breakfast.  Id. ¶ 14.  The plaintiffs contend that the drive from Greenpoint to work sites in Manhattan would normally take from 30 minutes to one hour.

The plaintiff foremen and laborers would work at various construction sites from 8:00 a.m. until 4:00 p.m.  The laborers were then allowed to leave the work site and, if they wished, proceed directly home, but they had the option of returning in the company vans to the Greenpoint shop.  The foremen assert that they were required to return the company vans to the Greenpoint shop and then meet with Robert and Pawel Capala to update them on the day's progress.   The meetings with Robert and Pawel Capala would normally last until approximately 5:30 p.m. at which time the foremen could return home.  Id. ¶ 26.

The plaintiff foremen have testified that, as part of their daily duties, they would complete hand-written time cards for each of the laborers that they supervised.  They aver that Robert and Pawel Capala specifically instructed them to record that each laborer completed only eight hours of work per day regardless of the number of hours they actually worked.  Id. ¶ 27.  The foremen assert that they had no discretion to choose which laborers they worked with or whether a laborer should be hired or fired and that many decisions they did make required the approval of either Robert or Pawel Capala.

The defendants admit that they compensated their employees for eight hours of work per day, see Defendants' Local Rule 56.1 Statement ("Def. 56.1 Statement"), dated Feb. 28, 2009, ¶ 3; however, they argue that the plaintiffs were fully compensated because they only worked between 7:30 a.m. and 4:00 p.m., less 30 minutes for lunch.

4

See id. ¶¶ 4, 5.  The essence of the defendants' opposition to the plaintiffs' FLSA claims is that the plaintiffs were never *required* to report to the defendants' shop in Greenpoint at 7:00 a.m.  The defendants proffer their own affidavits and depositions which explain that foremen and laborers were allowed to park their cars at the Greenpoint shop, change into work clothes there, and ride in the company's vans into Manhattan solely for their own convenience.  Most of the foremen and laborers lived near the Greenpoint shop, so it was more convenient, the defendants argue, for them to ride into Manhattan in the company's vans than to take public transportation or arrange for their own transportation.  The defendants also contend that some workers did not meet in Brooklyn but rather traveled directly from their homes to work sites in Manhattan.  The defendants do not dispute that the vans would make brief stops on the way to the work sites in order to pick up needed supplies and to allow the workers to buy breakfast.

Aside from the morning commute from the Greenpoint shop to the work sites in Manhattan, the workers frequently traveled from one work site to another during the work day.  The defendants did compensate the workers for this travel time.

## DISCUSSION

### 1.    Standard of Review

Summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986).  The moving party has the burden to demonstrate that no genuine issue of material fact exists.  Matsushita, 475 U.S. at 586.  When the moving party has asserted facts showing that the non-movant's claims cannot be

sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).   The non-moving party, however, "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998).  Credibility assessments and choices between conflicting versions of events, when material to the inquiry, are determinations that the Court must leave for a jury.  See Fischl v. Armitage, 128 F.3d 50, 55 (2d Cir. 1997).  The Court is compelled to draw all reasonable inferences in favor of the non-moving party.  Matsushita, 475 U.S. at 586.  A genuine issue exists if a reasonable jury could find in favor of the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

## 2.    Motion for summary judgment of the FLSA claim

Enacted to ensure that employees receive a "fair day's pay for a fair day's work," the FLSA, 29 U.S.C. § 201 *et seq.*, guarantees compensation for all work performed by employees covered by the Act.[4]  Gorman v. Consol. Edison Corp., 488 F.3d 586, 589 (2d Cir. 2007), cert. denied, 128 S.Ct. 2902 (2008).  "Work" was not defined in the FLSA, so the Supreme Court in Tenn. Coal, Iron & R. Co. v. Muscoda Local No. 123, 321 U.S. 590, 598 (1944), relied on both the statute's language and Webster's Dictionary to define it as "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business."  The Supreme Court later clarified that "exertion" was not necessary for an activity to constitute "work," for "an employer, if he chooses, may hire a man to do

---

[4] The defendants do not dispute that the plaintiff foremen and laborers are covered by the FLSA.

nothing, or to do nothing but wait for something to happen." Armour & Co. v. Wantock, 323 U.S. 126, 133 (1944).  In essence, the "work" inquiry asks whether the "time is spent predominantly for the employer's benefit or for the employee's . . . a question dependent upon the circumstances of the case." Id. (cited in Singh v. City of New York, 524 F.3d 361, 367 (2d Cir. 2008)).

Not all work-related activities constitute "work" that must be compensated under the FLSA.  Gorman, 488 F.3d at 589-90.  The Portal-to-Portal Act of 1947, 29 U.S.C. § 251 *et seq.*, ensures that employers will not be liable for failure to pay minimum wages or overtime compensation for activities that are not themselves part of the workday. The statute specifies two types of such activity:

> (1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and
>
> (2) activities which are preliminary to or postliminary to said principal activity or activities, which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.

29 U.S.C. § 254(a).  The regulations that inform the FLSA define "principal activities" as those the employee is employed to perform.  Gorman, 488 F.3d at 590 (citing 29 C.F.R. § 790.8(a)).  The Portal-to-Portal Act also states that, notwithstanding the exemptions from liability established by subsection (a), employers will not be relieved of liability if the pre-workday activity is compensable by either an express provision of a contract or by a custom or practice at the establishment where the employee is employed.  § 254(b).

The Portal-to-Portal Act was drafted and codified largely in response to the Supreme Court's decision in Anderson v. Mount Clemens Pottery Co., 328 U.S. 680,

691-93 (1946), which held that the FLSA required that workers be compensated for putting on aprons and overalls and walking from the front gate of the employer's factory to their positions along the production line.  In amending the FLSA, the Portal-to-Portal Act "was intended to relieve employers from liability for preliminaries, most of them relatively effortless, that were thought to fall outside the conventional expectations and customs of compensation."  Gorman, 488 F.3d at 590 (citing Reich v. New York City Transit Auth., 45 F.3d 646, 649 (2d Cir. 1995)).  Much of the case law on the Portal-to-Portal Act considers the line between an employee's principal activity and those activities that precede and follow that principal activity.  The case at bar is another in that long line.

One of the first authorities in that line was Steiner v. Mitchell, 350 U.S. 247 (1956).  In that case, the Supreme Court considered whether changing clothes and showering were among the principal work activities for workers at a battery plant who, because of the exposure to toxic chemicals inherent in their jobs, were compelled to don protective clothing prior to their work and to remove their clothes and shower following their work.  The Supreme Court held that, under normal circumstances, changing clothes and showering would not be compensable, but because the employees would not have been able to work in the battery plant without changing clothes and showering, those activities were compensable "under the portal-to-portal provisions of the Fair Labor Standards Act [because] those activities [were] an *integral and indispensible part of the principle activities* for which the covered workmen are employed."  Id. at 256 (emphasis added).  On the same day that Steiner was decided, the Supreme Court held in Mitchell v. King Packing Co., 350 U.S. 260, 263 (1956), that because sharpening

8

knives was integral and indispensible to the task of butchering animals, the employees of a packing plant must be paid for the time spent before and after their principal butchering duties during which they sharpened the knives they used.  Id. at 262.

In the more recent case of IBP, Inc. v. Alvarez, 546 U.S. 21 (2005), the Supreme Court observed that, although the Portal-to-Portal Act expressly excludes commuting and preliminary and postliminary activities from coverage under the FLSA, it does not purport to change the previously articulated definition of "work" and therefore does not effect how work hours were computed "within" the workday.  Id. at 28. (relying in part on Department of Labor regulation 29 C.F.R. § 790.6(a) ("the Portal Act does not affect the computation of hours worked within the 'workday' proper, roughly described as the period 'from whistle to whistle,' and its provisions have nothing to do with the compensability under the Fair Labor Standards Act of any activities engaged in by an employee during that period")).  The Supreme Court also observed that the Department of Labor had adopted its "continuous workday" rule which held that the workday was defined as "the period between the commencement and completion on the same workday of an employee's principal activity or activities."  Id. at 29 (quoting § 790.6(b)).

The first issue in IBP was whether the time that the plaintiff employees spent walking between the employee changing area and the production line was compensable under the FLSA.  Id. at 24.  The plaintiffs argued that they were due compensation for the time they spent putting on protective gear after arriving at defendant IBP's factory and the time they spent walking from the room in which they donned their protective gear to their positions on the factory floor.  IBP had been compensating them for the hours they spent cutting and bagging meat and for only four minutes of clothes-

changing time.  Id. at 30-31.   Rejecting IBP's contention that the Portal-to-Portal Act applied to the time that its employees spent walking to their work stations after they donned their protective gear, the Supreme Court held that "during a continuous workday, any walking time that occurs after the beginning of the employee's first principal activity and before the end of the employee's last principal activity is excluded from the scope of [the Portal-to-Portal Act], and as a result is covered by FLSA." Id. at 37.  Because donning and doffing protective gear were themselves principal activities due to being "integral and indispensible part" of the employees' principal activities for reasons similar to those in Steiner, the locker rooms where the employees donned their protective gear was the relevant "place of performance" of the first principal activity and therefore was where the employees' workday began.  The Supreme Court reasoned that "[w]alking to that place *before* starting to work is excluded from FLSA coverage, but the statutory text does not exclude walking from that place to another area within the plant immediately *after* the workday has commenced." Id. at 34. (emphasis added).  The holding in IBP relied in part on a Department of Labor regulation that stated "[w]here an employee is required to report to a meeting place to receive instructions or to perform other work there, or to pick up and to carry tools, the travel from the designated place to the work place is part of the day's work, and must be counted as hours worked . . . ." 29 C.F.R. § 785.38.

In the case at bar, the defendants argue, first, that the principal activity which the plaintiffs were hired to perform "consisted of outdoor activities such as roofing and brick pointing at various Manhattan buildings" and that the travel from the defendants' shop in Greenpoint to these work locations was, in essence, travel to the place of

performance of the principal activity that the Portal-to-Portal Act excludes from being a compensable activity under the FLSA.  Defendants' Memorandum of Law ("Def. Mem."), dated Jan. 15, 2009, at 7.  Second, they argue that any activity the employee plaintiffs engaged in prior to beginning work at the construction sites in Manhattan, including dressing in their work clothes, loading the vans, going to the supply store, and getting breakfast, constituted "preliminary activities" that an employer need not compensate his employees for.  Specifically regarding the time spent dressing, the defendants rely on Gorman, 488 F.3d at 586, for the proposition that "there is no chargeable time [] to be computed for either minimum wages or overtime for time spent by workers for changing clothes, wearing safety glasses, or attaching helmets to their heads." Def. Mem. at 9.  Third, they argue that the time the employees spent getting supplies and breakfast during the drive from Greenpoint into Manhattan is also not compensable.  In all, the defendants contend that the Portal-to-Portal Act precludes the plaintiffs from receiving compensation for their work-related activities between 7:00 a.m. and 7:30 a.m.

Summary judgment of the FLSA claim must be denied because the parties dispute whether the defendant employers required the plaintiffs to report to work at the Greenpoint shop by 7:00 a.m. or whether the employees had the option to report directly to the work sites in Manhattan.  Contrary to the defendants' evidence suggesting that laborers and foremen chose to report to the Greenpoint shop every morning for their own convenience, the plaintiffs and other non-party witnesses have testified that the employees were obligated to be at the Greenpoint shop at 7:00 a.m. to begin the work day, at which time they would load the company vans with tools or other supplies

and receive daily instructions from the individual defendants.  Relying on the same Department of Labor regulation cited in IBP, Pl. Mem. at 8 (citing 29 C.F.R. § 785.38 discussed *supra*), the plaintiffs argue that the time they spent at the Greenpoint shop and the time spent traveling into the city in the company vans would also be compensable as part of the continuous workday because they were required to arrive at the Greenpoint shop at 7:00 a.m. to load supplies into the vans and get instructions from Robert or Pawel Capala.[5]

The critical inquiries here are *when* and *where* the workday starts, for once it begins, the continuous workday rule applies and the Portal-to-Portal Act's exceptions for travel and preliminary activities are inapplicable.  The parties here clearly dispute when and where the foremen and laborers were expected to report to work.  Because the defendants' evidence suggests that the workday started at the work sites in Manhattan and the plaintiffs' evidence suggests that the workday started at 7:00 a.m. at the Greenpoint shop, there is a question of fact that requires the Court to deny the defendants' motion for summary judgment.

## 3.    Motion to deny class certification

On January 15, 2009, the plaintiffs moved for class certification pursuant to Fed. R. Civ. P. 23(b)(3), defining the class as:

---

[5] Plaintiffs also argue that how much time was spent making breakfast stops remains at issue.  Pl. Mem. at 9.  They contend that short breaks in order to purchase food or coffee must be compensated because they do not constitute meal periods that may be excluded from a worker's hours.  Pl. Mem. at 9 (relying on a Department of Labor regulation stating that "[b]ona fide meal periods are not worktime.  Bona fide meal periods do not include coffee breaks or time for snacks. . . Ordinarily 20 minutes or more is long enough for a bona fide meal period.  A shorter period may be long enough under special conditions.")(29 C.F.R. § 785.19).  The parties also disagree on how often the vans stopped on the way to the work sites to get supplies and to allow the workers to get breakfast.

> All employees of the Defendants during the six years immediately preceding the initiation of this action [complaint filed on Aug. 29, 2007] up to the date of this decision, who performed work as roofers, bricklayers, masons, building laborers, drivers, foremen and other manual workers with the same or similar duties who are entitled to compensation from the Defendants for unpaid minimum wages, and/or overtime premium wages, and/or spread-of-hours wages, and/or other wages, and who are asserting claims under the New York State Labor Law, including without limitation, Sec. 190 *et seq.* and Sec. 650 *et seq.* as well as the wage orders promulgated thereunder.

See Notice of Motion to Certify the Class, dated Jan. 15, 2009.[6]  The parties thereafter stipulated that the motion to certify would be held in abeyance until the Court issued an order disposing of the parties' summary judgment motions.  Notwithstanding that agreement, the defendants move to dismiss the class action because the "plaintiffs have failed to state and qualify for class action under Fed. R. Civ. P. 23(a) by failing the numerosity and/or adequate class representation criteria."  Def. Mem. at 11.

This Court held in Parker v. Time Warner Entertainment Co., L.P., 198 F.R.D. 374, 376-77 (E.D.N.Y. 2001), vacated on other grounds, 331 F.3d 12 (2d Cir. 2003), that

> [b]efore a plaintiff moves for class certification, a defendant may test the propriety of the action by a motion for denial of class certification.  Even where defendant moves for denial of class certification before plaintiff has sought certification, the burden of establishing the propriety of a class action remains with the plaintiff. . . .  In order to maintain a class action, Rule 23, Fed. R. Civ. P., requires a movant to satisfy all four requirements of Rule

---

[6] The purported class would share only the state law wage claims as the FLSA claims cannot be certified as a class action because the statute that creates a private cause of action under the FLSA authorizes only a collective action procedure as opposed to a class action procedure pursuant to Fed. R. Civ. P. 23.  See 29 U.S.C. § 216(b).  Under the collective action procedure, similarly situated employees are entitled to join in the named plaintiffs' wage claims by "opting-in" to the action, or signing and filing a consent to joinder with the Court.  See id.  On the other hand, under New York State law, private causes of action for unpaid wages are authorized under New York Labor Law § 663 and are appropriate for class certification.  See Niemiec v. Ann Bendick Realty, 04 Civ. 897 (ENV), 2007 WL 5157027, at *3 n. 2 (E.D.N.Y. April 23, 2007).

> 23(a) – numerosity, commonality, typicality, and fair and adequate
> protection of the class by the representative plaintiffs – *and* to
> qualify under one of the three subdivisions of 23(b).

(internal citations and quotation marks omitted); see also Fedotov v. Roach & Assoc.,

P.C., 354 F. Supp. 2d 471, 478 (S.D.N.Y. 2005) ("The defendant need not wait for the

plaintiff to act, however.  The defendant may move for an order denying class

certification.").  The Second Circuit has emphasized that Rule 23 should be "given

liberal rather than restrictive construction," Marisol A. v. Giuliani, 126 F.3d 372, 377 (2d

Cir. 1997), and "it seems beyond peradventure that the Second Circuit's general

preference is for granting rather than denying class certification." Cortigiano v.

Oceanview Manor Home for Adults, 227 F.R.D. 194, 203 (E.D.N.Y. 2005) (Glasser, J.)

(quoting Leider v. Ralfe, 01 Civ. 3137 (HB), 2003 WL 22339305, at *11 (S.D.N.Y. Oct. 10,

2003)).

      While the Court may, in some cases, rely only on the pleadings to certify a class,

the Court must often delve deeper, requiring discovery to establish a sufficient

evidentiary record to assist the Court's determination.  Id. at 204 (citing Gen. Tel. Co. of

the Sw. v. Falcon, 457 U.S. 147, 160 (1982), and Sirota v. Solitron Devices, Inc., 673 F.2d

566, 571 (2d Cir.1982)).   The ultimate question is not whether the plaintiffs have stated

a cause of action or will prevail on the merits but whether they have met the

requirements of Rule 23.  Id. (citing Eisen v. Carlisle and Jacquelin, 417 U.S. 156, 178

(1974)).

### i.    Numerosity

      The plaintiffs must show that the class is so numerous that joinder of all

members is impracticable.  Fed. R. Civ. P. 23(a)(1).  "Impracticability does not mean

impossibility of joinder, but rather difficulty or inconvenience of joinder." <u>Noble v. 93 Univ. Place Corp.</u>, 224 F.R.D. 330, 338 (S.D.N.Y. 2004).  Courts in the Second Circuit presume numerosity when the purported class is composed of at least 40 members.  <u>See Consol. Rail Corp. v. Town of Hyde Park</u>, 47 F.3d 473, 483 (2d Cir. 1995).  Plaintiffs need not present a precise calculation of the number of class members; rather, they must show some evidence of the class members that, in effect, provides the Court with a reasonable estimate.  <u>Noble</u>, 224 F.R.D. at 338.  The Court may draw reasonable inferences from that evidence and rely on those inferences when making its determination.  <u>Id.</u>; <u>see also</u> <u>Cortigiano</u>, 227 F.R.D. at 204 ("courts are empowered to make common sense assumptions to support a finding of numerosity.") (quoting <u>Nicholson v. Williams</u>, 205 F.R.D. 92, 98 (E.D.N.Y. 2001)).

The defendants have produced a list of employees for the time period relevant to these claims[7] that shows that Capala Bros. employed a total of 74 foremen and laborers. <u>See</u> Declaration of Felipe Orner ("Orner Decl."), dated Jan. 15, 2009, Ex. K.[8]  While this evidence certainly suggests that the purported class is greater than 40 persons, the defendants argue to the contrary.  First, they assert that 17 of the 74 employees have submitted affidavits in which they state that they will not join this action.  Second, the defendants argue that out of the 74 employees, roughly 25 were part-time employees who "clearly [are] not in the same class as the full-time employees" because their claims are smaller in comparison to those of full-time employees.  <u>See</u> Def. Mem. at 12-13. Lastly, the defendants argue that the foremen and laborers cannot comprise the same

---

[7]  The relevant time period is the six years prior to August 29, 2007, when this action was initiated, up to the date of the decision disposing of the case on the merits.  <u>See</u> Plaintiffs' Memorandum of Law in Support of Motion for Class Certification, dated Jan. 15, 2009.
[8] The employee list is actually 78 names long, but the parties agree that four of those names are administrative staff who would be excluded from the class.

class because the foremen seek compensation for the work they did between 4:00 p.m. and 5:30 p.m., a claim that the laborers do not make.  See Def. Mem. at 11-12.  These arguments are not persuasive.  Even if the Court were to subtract from the list of 74 employees those who have purportedly disclaimed any interest in taking part in this litigation, the purported class would remain presumptively numerous.  As to the distinctions between the claims of the full-time and the part-time employees and between the claims of the foremen and the laborers, the complaint and the proffered evidence suggest that any individualized questions regarding the number of hours that a specific employee worked will not predominate over the questions of fact and law that are relevant to all members of the purported class, including when and where the workday began.

The numerosity inquiry, however, is not limited to counting the number of potential class members.  The Court may consider other relevant factors, including the promotion of judicial economy by avoiding a multiplicity of similar actions, the geographic dispersion of class members, the financial resources of class members, and the ability of the claimants to institute individual suits.  See Cortigiano, 227 F.R.D. at 205 (quoting Matyasovszky v. Hous. Auth. of the City of Bridgeport, 226 F.R.D. 35, 40 (D.Conn. 2005)).  Notwithstanding that the purported class members are not dispersed across a wide geographic area, these factors on balance suggest that joinder would be impracticable.  Some of the purported class members are the present employees of Capala Bros. and thus would presumably be hesitant to bring their own actions for fear of reprisal by the company.  See Cortigiano, 227 F.R.D. at 204.  Moreover, the Court infers, as it may, that many if not most of the purported class members are persons with

inadequate resources to exercise their rights by prosecuting their own claims.  See id. at 204-05.

In sum, the purported class is presumptively numerous, and the relevant considerations suggest further that the plaintiffs have satisfied their burden to show that joinder would be impracticable.

### ii.    Adequacy

The defendants argue that the named plaintiffs do not fairly and adequately protect the interests of the proposed class.  See Fed. R. Civ. P. 23(a)(4).  The Court must determine 1) whether plaintiffs' interests are antagonistic to the interest of other members of the class, and 2) whether plaintiffs' attorneys are experienced and able to conduct the litigation, Cortigiano, 227 F.R.D. at 206-7 (quoting Baffa v. Donaldson, Luftkin & Jenrette Sec. Corp., 222 F.3d 52, 60 (2d Cir. 2000)), and thereby "satisfy itself that the proposed lead plaintiffs possess sufficient interest to pursue the vigorous prosecution of their claims."  Id. at 207; see also Ansoumana v. Gristede's Operating Corp., 201 F.R.D. 81, 85 (S.D.N.Y. 2001) (stating that the plaintiffs must demonstrate that the class counsel is qualified, experienced, and generally up to the task of conducting the litigation and that the named plaintiffs harbor no interests that conflict with the other members of the putative class) (citing Marisol A. ex rel. Forbes v. Giuliani, 126 F.3d 372, 378 (2d Cir. 1997)).  "[O]nly conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status."  Ansoumana, 201 F.R.D. at 85.

The defendants do not contend that the plaintiffs' counsel is inexperienced or unable, nor do they contend that the interests of the named plaintiffs are adverse to the interests of the putative class members.  Instead, the defendants attack the character of the named plaintiffs.  Relying on Noble v. 93 Univ. Place Corp., 224 F.R.D. 330, 339 (S.D.N.Y. 2004), which states that a court may consider whether the potential class representative "is of sufficient moral character to represent a class," the defendants assert that the plaintiffs are inadequate representatives because they "have pursued a systematic and continuous pattern of physical threats" against their former coworkers and have otherwise demonstrated immoral character.  See Def. Mem. at 14.  To substantiate their argument, the defendants highlight the allegations in their amended third counterclaim against the plaintiffs for tortious interference,[9] the allegations that some of the plaintiffs have filed false unemployment insurance applications, and the fact that plaintiffs Filipkowski and Lapinski invoked their Fifth Amendment right against self-incrimination during their depositions.  See id.  In addition, the defendants proffered affidavits from their employees that, in the defendants' words, "indicate the level of violence and threats that most of these plaintiffs have imposed on the workers who after one and half year [*sic*] of litigation have resisted their unsuccessful attempts to have them join this litigation."  Defendants' Reply Memorandum ("Def. Reply Mem."), dated Feb. 27, 2009, at 20.  In response, the plaintiffs deny that there is any evidence to suggest that the named plaintiffs do not have the "moral character" to adequately represent the class.

---

[9] The third counterclaim alleges that the plaintiffs physically threatened other employees of Capala Bros. to compel them to quit their jobs.  See Declaration of Philip Orner, dated Feb. 4, 2009, Ex. D.

The defendants' reliance on <u>Noble</u> is misplaced.  Although the district court in that case does not expand on what it means by "sufficient moral character," it does cite to <u>Savino v. Computer Credit, Inc.</u>, 164 F.3d 81, 87 (2d Cir. 1998), which held that "courts may consider the honesty and trustworthiness of the named plaintiffs" when considering whether they would adequately represent the proposed class.  The Second Circuit in that case affirmed the district court's holding that the plaintiff did not adequately represent the purported class in a Fair Debt Collection Practices Act suit because he had made numerous contradictory statements concerning when he received a letter from the defendant, an issue that formed the very basis of his cause of action. <u>Id.</u>  The panel agreed with the district court that the inconsistencies "surely would create serious concerns as to his credibility at any trial" and would thus inadequately serve the interests of the class members.  <u>See id.</u>  Similarly, in <u>Panzirer v. Wolf</u>, 663 F.2d 365, 368 (2d Cir. 1981), <u>vacated as moot</u>, 459 U.S. 1027 (1982), the Second Circuit found the plaintiff to be an inadequate class representative because she gave four different accounts of a conversation with her stock broker that was central to her Securities Exchange Act claim.  These cases instruct that the "sufficient moral character" of which <u>Noble</u> speaks does not imply that a class representative must be morally upstanding; rather, it connotes that he or she must not have damaged his or her credibility regarding those issues that are central to the action.  The Court has adhered to this understanding in <u>Harrison v. Great Springwaters of Am., Inc.</u>, 96 Civ. 5110 (ILG), 1997 WL 469996, at *6 (E.D.N.Y. June 18, 1997) (recognizing that denial of certification on the basis of inadequate credibility only occurs when the problems call the validity of the plaintiffs' entire case into question), and <u>Sheehan v. Purolator, Inc.</u>, 103 F.R.D. 641, (E.D.N.Y. 1984) (holding that challenges to the plaintiff's credibility based on alleged incidents

19

collateral to the discrimination suit did not render the plaintiff unfit to serve as a class representative), aff'd, 839 F.2d 99 (2d Cir. 1988), and other courts in this district have also similarly held.  See, e.g. In re Zyprexa Prods. Liab. Litig., 253 F.R.D. 69, 198 (E.D.N.Y. 2008) ("[t]he credibility of the class representatives should only come into play during the class certification process if they are so lacking in credibility that they are likely to harm their case.") (internal quotation marks omitted); Koenig v. Benson, 117 F.R.D. 330, 338 (E.D.N.Y. 1987) ("a proposed class representative can be ruled inadequate under Rule 23(a)(4) if he is vulnerable to attacks on his credibility concerning the key facts at issue in the case.")

To the extent that the Court should examine the named plaintiffs' moral character more generally, the district court in Jane B. by Martin v. New York City Dept. of Soc. Servs., 117 F.R.D. 64 (S.D.N.Y. 1987), considered a provision of the oft-quoted Federal Practice and Procedure:

> In order to assess the adequacy of the named representatives, courts have looked to factors such as their honesty, conscientiousness, and other affirmative personal qualities.  If the representative displays a lack of credibility regarding the allegations made . . . then the court may conclude that Rule 23(a)(4) is not satisfied.

Id. at 70-71 (quoting 7A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure, § 1766 at 308-310 (2d ed. 1986) (citations omitted)).  Finding the commentary instructive, the court continued that "[t]he inquiry, then, into the representatives' personal qualities is not an examination into their moral righteousness, but rather an inquiry directed at improper or questionable conduct arising out of or touching upon the very prosecution of the lawsuit."  Id. at 71.

Whether the Court should examine the named plaintiffs' overall character or should restrict its inquiry to their credibility, it is clear that the Court may not find them inadequate for conduct that does not touch upon the central issues in this litigation.  If that be the standard, then the defendants have not shown the plaintiffs to be inadequate.  They neither argue nor proffer evidence that the plaintiffs are so lacking in credibility that they are likely to harm their case.  They proffer testimony that the representative plaintiffs engaged in lewd and immoral behavior while they were employed by Capala Bros. prior to the start of this litigation, but such behavior could hardly be characterized as touching on the lawsuit itself.  Finally, although the defendants' briefs and affidavits are replete with allegations of the plaintiffs' wrongdoing with regard to prosecution of this lawsuit, there is a dearth of evidence in the present record to substantiate those allegations.

In contrast, the evidence clearly shows that the plaintiffs' interests in obtaining the requested relief are not antagonistic to those of the other class members.  Because the crux of this inquiry is whether interests of the representatives and the class either coincide or conflict, the Court holds that the plaintiffs are adequate class representatives.  Noting that the defendants do not argue in their briefs that plaintiffs' counsel would be inadequate as class counsel, the Court finds further that plaintiffs' counsel is qualified and able to represent the class and has demonstrated his willingness to do so.  The motion to deny class certification is therefore denied.

4.      **Motion to dismiss the claim for legal fees pursuant to New York Labor Law § 198**

New York Labor Law § 198 (McKinney 2009) states, in pertinent part, that "[i]n any action instituted upon a wage claim by an employee or the commissioner in which the employee prevails, the court shall allow such employee reasonable attorney's fees . . . ." § 198(1)(a).  The defendants aver that "the plaintiffs request legal fees invoking N.Y. Labor Law Sec. 198.  Yet, such claim does not state or present a cognizable theory of law because it has been preempted by <u>Garcia v. Allied Parking Sys.</u>, 752 N.Y.S.2d 316 (1st Dep't., 2002), . . . ."  Def. Mem. at 17.  Notwithstanding the fact that a judicial decision does not *preempt* a state statute, this misconstrues <u>Garcia</u>.  The court in that case considered a claim for attorney's fees stemming from a dispute over whether employees had been properly compensated pursuant to a collective bargaining agreement.  To the extent that the claims in <u>Garcia</u> required interpretation of the collective bargaining agreement, the state causes of action, including the claim for attorney's fees, were preempted by the Labor-Management Relations Act, 29 U.S.C. § 185 *et seq.*[10]  Because <u>Garcia</u> is clearly inapposite here, the defendants' motion is meritless and is denied.

---

[10] The relevant passage from <u>Garcia</u> reads:

> Plaintiff's claims for attorneys' fees under Labor Law § 198, based on defendants' purported violation of Labor Law § 191(a)(1)(i) in failing to pay him overtime at the rate provided in his collective bargaining agreement, were properly dismissed. Such claims necessarily require interpretation of the collective bargaining agreement, since defendants are disputing the applicability of the wage schedule invoked by plaintiff, and are therefore preempted by 29 USC § 185 (Labor-Management Relations Act) ( <u>see</u> <u>Livadas v. Bradshaw</u>, 512 U.S. 107, 123-124, 114 S.Ct. 2068, 129 L.Ed.2d 93).

<u>Garcia</u>, 752 N.Y.S.2d at 317 -318.

5.      **Motion to strike the plaintiffs' answer as untimely**

After the defendants filed their answer with counterclaims against the plaintiffs

on October 18, 2007, the parties stipulated that the plaintiffs would have until

November 19, 2007, to reply to those counterclaims or file a motion to dismiss.  See

Docket No. 7.[11]  The plaintiffs filed a timely motion to dismiss the second, third, and

fourth counterclaims by that November 19 deadline but did not file their reply to the

first counterclaim until December 17, 2007.  The defendants argue that the reply to the

first counterclaim was untimely as it was filed after November 19.  Relying on DL v.

District of Columbia, 450 F. Supp. 2d 11 (D.D.C. 2006), the defendants assert that

untimely pleadings should be stricken when filed without leave of the court, without an

application for an extension of time, or without any statement as to good cause.  The

defendants ask the Court to order a default judgment on the first counterclaim in its

favor.

The defendants mistakenly rely on Fed. R. Civ. P. 8(d), a section entitled

"Pleading to be concise and direct; alternative statements; inconsistency," as providing

for default judgments.  See Def. Mem. at 18.  The correct provision is Fed. R. Civ. P.

55(a) ("Rule 55(a)"), and since the defendants' motion to strike is, in substance, a

motion for default judgment, it shall be treated as such.  Rule 55(a) states that "[w]hen a

party against whom a judgment for affirmative relief is sought has failed to plead or

otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must

---

[11] The stipulation read, in pertinent part:

> It is hereby stipulated and agreed by and between the undersigned, the attorneys of
> record for the Plaintiffs and the Defendants, that the date by which Plaintiffs shall file a
> Reply to Verified Answer with Counterclaims or Motion to Dismiss the Counterclaims
> interposed by Defendants is extended to November 19, 2007; . . ."

See Docket No. 7.

enter the party's default."  Here, the plaintiffs did "otherwise defend" the defendants' counterclaims for relief; therefore, a default judgment is not appropriate.

Fed. R. Civ. P. 12(a)(4) ("Rule 12(a)(4)") provides that the service of a motion pursuant to Rule 12 suspends the movant's time to file a responsive pleading until 10 days following the disposition of the motion.  Interpreting that rule, courts have held that filing a partial motion to dismiss will suspend the time to answer those claims or counterclaims that are not subject to the motion.  See Finnegan v. Univ. of Rochester Med. Ctr., 180 F.R.D. 247, 249-50 (W.D.N.Y. 1998) (collecting cases).  If the opposite rule controlled and partial motions to dismiss did not suspend a party's obligation to reply to additional claims, the result would be "a procedural thicket" of piecemeal answers that would poorly serve judicial economy.  See Ricciuti v. New York City Transit Auth., 90 Civ. 2823 (CSH), 1991 WL 221110, at *2 (S.D.N.Y. Oct. 3, 1991).  The case cited by the defendants, DL v. District of Columbia, is not to the contrary and is largely inapposite insofar as it addresses the untimely filing of a supplementary brief and not a pleading.  See 450 F. Supp. 2d at 20.

By filing a motion to dismiss three of the defendants' four counterclaims on Nov. 19, 2007, the plaintiffs' time to reply to the first counterclaim was suspended until 10 days following the Court's order on that motion.  The Court's order was issued on November 12, 2008; therefore, the plaintiffs' reply to the first counterclaim filed on December 17, 2007, was timely insofar as it was submitted approximately one year before the plaintiffs were required to reply.  The defendants' argument that the stipulation somehow rendered Rule 12(a)(4) inapplicable is meritless.  The motion to strike the reply and for a default judgment is denied.

**6.      Motion for leave to amend the counterclaims**

The defendants request the Court's leave to amend their counterclaims to include a claim against the plaintiff foremen for contribution or indemnity should the defendants be found liable for not fully compensating the plaintiff laborers.  The defendants contend that the foremen were responsible for overall management of the laborers and that "such level of input and authority denotes also a level of responsibility and consequential liability against such foremen . . . ."  Def. Mem. at 20.  The defendants fail to cite any legal authority in support of their argument and do not attach the proposed counterclaim to their motion.  In response, the plaintiffs argue that amendment would be futile because the foremen are not the "employers" of the laborers.

Liability under the FLSA is predicated on whether a party is an "employer."  The FLSA broadly defines "employer" as including "any person acting directly or indirectly in the interest of an employer in relation to an employee. . . ."  29 U.S.C. § 203(d).[12] Both the Second Circuit and federal regulations recognize that a single employee may have two or more distinct employers, collectively "joint employers," for the purposes of the FLSA.  See Barfield v. New York City Health and Hosps. Corp., 537 F.3d 132, 141 (2d Cir. 2008) (Raggi, J.) (citing 29 C.F.R. § 791.2(a)).  In Barfield, Judge Raggi noted that the "striking breadth" of the FLSA's definition of "employ" requires a determination of whether the "economic reality" of the relationship at issue suggests an employer-employee relationship.  Id.  Barfield discussed the three cases in this Circuit that speak authoritatively on the "economic reality" test: Carter v. Dutchess Cmty. Coll., 735 F.2d 8

---

[12] With many exceptions inapplicable here, an employee is defined as "any individual employed by an employer."  § 203(e).  "Employ" is defined as including "to suffer or permit to work."  § 203(g).  Neither definition is particularly informative.

(2d Cir. 1984) (inquiring as to the degree of formal control exercised over a worker required to establish an employer-employee relationship), Brock v. Superior Care, Inc., 840 F.2d 1054 (2d Cir. 1988) (inquiring as to the distinction between independent contractors and employees), and Zheng v. Liberty Apparel Co., 355 F.3d 61 (2d Cir. 2003) (inquiring as to the degree of functional control over a worker required to establish an employer-employee relationship when there was not formal control).  Those cases, each with their own unique factual context, provide "a nonexclusive and overlapping set of factors" to ensure that the economic reality test is sufficiently broad and flexible to give proper effect to the broad language of the FLSA.  Barfield, 537 F.3d at 143.[13]

The parties rely on Carter v. Dutchess Cmty. Coll., 735 F.2d 8, 12 (2d Cir. 1984), the first case discussed in Barfield and the earliest Second Circuit decision to employ the economic reality test.  The precise issue in that case was "whether prisoners ever may be considered employees for the purposes of the minimum wage provisions of the FLSA." Id.  It was in this context that the panel held that the economic reality of the relationship at issue is best understood by inquiring into whether the alleged employer (1) could hire and fire the employees, (2) control the schedule or conditions of employment, (3) determine the rate and method of payment, and (4) maintain the employment records. Id.  The court held that "[t]he power to control a worker clearly is a crucial factor in determining whether an employment relationship exists" and that "[i]t runs counter the breadth of the statute . . . to impose a qualification which permits an employer who

---

[13] New York Labor Law § 190 defines an "employer" as broadly as the FLSA does, and the test for an "employer" is essentially identical under federal and state law.  Zheng, 355 F.3d at 76; see also Doo Nam Yang v. ACBL Corp., 427 F. Supp. 2d 327, 342 n.25 (S.D.N.Y. 2005) (commenting that the economic reality test is applied to determine whether a party may be liable as an "employer" under both federal and state law).

exercises substantial control over a worker, but whose hiring decisions occasionally may be subjected to a third party's veto, to escape compliance with the Act."  Id.

The defendants argue that the plaintiff foremen were responsible for opening the Greenpoint shop on a daily basis, wearing uniforms that differentiated them from the laborers, using company-issued cell phones and credit cards, and for completing and submitting daily time cards for each of the laborers.  Specifically, they contend that completing the laborers' time cards satisfies the "maintained employment records" factor in Carter, see Def. Reply Mem. at 22, and based on this alone, the defendants would have the Court conclude that the economic reality of the foremen-laborer relationship was that of employer-employee.

To the contrary, Carter clearly implies that no single factor alone is dispositive of the economic reality determination.  Rather, the totality of the circumstances must show that the alleged employer possessed the power to control the alleged employee.  Here, the totality of the circumstances establishes that the foremen were not employers for the purposes of the FLSA.  The defendants conceded at oral argument that the foremen could not hire or fire laborers and had no discretion to change the laborer's rate or method of compensation.  See Oral Argument Tr., dated April 24, 2009, at 32:19-33:16. There is also no evidence to suggest the foremen could choose which laborers each would supervise.  The record does not support the defendants' contention that the foremen can be considered employees under the FLSA, and if they were not employers, then the amendment that the defendants seek would not state a claim under the FLSA. The defendants' motion to amend the counterclaims is therefore denied.

27

7.    **Motion for summary judgment of claims against individual defendants and cross-motion for summary judgment on the issue of whether individual defendants are employers under FLSA**

The defendants argue that the claims against the individual defendants Robert and Pawel Capala should be dismissed because the plaintiffs have not carried the heavy burden of demonstrating that the corporate veil of Capala Bros. should be pierced.  Def. Mem. at 15-16.  The plaintiffs, in turn, have filed a cross-motion for partial summary judgment in which they argue that the Court should find as a matter of law that the individual defendants are employers under the FLSA.  Both motions are best considered together because they ask the same question:  whether defendants Robert and Pawel Capala can be held personally liable for any unpaid wages owed to the plaintiffs.

The defendants aver that the plaintiffs' complaint alleged that the individual defendants were liable under a piercing of the corporate veil theory and not as employers under the FLSA.  Because the plaintiffs have not proffered any evidence to suggest that the individual defendants were abusing the corporate form, the defendants contend that the claims against Robert and Pawel Capala should be dismissed.  <u>See</u> Def. Reply Mem. at 24.  A review of the complaint shows that, while the plaintiffs' complaint does indeed allege that Capala Bros. was merely "the alter ego" of the individual defendants, <u>see</u> Complaint ¶ 28, it also alleges that "[t]he Corporate Defendant and the Individual Defendants are joint employers of Plaintiffs, as a result, all Defendants, individually and collectively, and jointly and severally, are liable for all claims made herein."  Complaint ¶ 33.  The defendants therefore misconceive the theory of liability that the plaintiffs now propound: under the "economic reality" test employed in <u>Carter</u>,

discussed *supra*, the individual defendants are employers and are thus liable for unpaid wages.  In addition to Carter, the plaintiffs also rely on Ansoumana v. Gristede's Operating Corp., 255 F. Supp. 2d 184, 192-93 (S.D.N.Y. 2003).  In that case, the district court held that individual officers or directors of a corporate employer may also "be deemed employers under the FLSA where 'the individual has overall operational control of the corporation, possesses an ownership interest in it, controls significant functions of the business, or determines employees' salaries and makes hiring decisions."  That case relied in part on Herman v. RSR Security Servs., Ltd., 172 F.3d 132 (2d Cir. 1999), in which the Second Circuit held that a shareholder and member of the board of directors was an employer under the FLSA where he had authority to hire management, occasionally supervised employee work schedules, and had authority to sign payroll checks.  The panel in Herman held that "the overarching concern is whether the alleged employer possessed the power to control the workers in question" and that a court must consider all the circumstances when determining operational control.  Id. at 139-40.

The record shows that Robert Capala held a 50% share of the company, hired and fired foremen and laborers, decided how much to pay them, prepared financial records, supervised and prepared payroll, gave daily instructions to the foremen and laborers, oversaw some work projects, frequently visited job sites, and decided which laborers would go to which job sites.  Pawel Capala owned 50% of the corporation, oversaw the progress of construction work, and discussed with Robert Capala whether to expand or contract the corporation's workforce.  One of the plaintiffs testified that Pawel Capala gave him a pay raise.  See Filipkowski Decl. ¶ 13.  Both Robert and Pawel Capala were intimately involved with most business decisions facing the company; they would

discuss hiring and firing workers, <u>see</u> Plaintiffs' Ex. 12 at 36; they each had the authority to fire employees, <u>see</u> Plaintiff's Ex. 8 at 106; and either one could decide which laborers and foremen would work at a certain work site.  <u>Id.</u> at 107.

The defendants do not dispute that Robert Capala was an employer under FLSA. They do argue that it remains a question of fact whether Pawel Capala possessed enough authority over Capala Bros. employees to be considered an employer under the FLSA. The Court disagrees.  Although Robert Capala was more involved with controlling and supervising the laborers and foremen than his brother, the only reasonable inference drawn from the evidence is that Pawel Capala enjoyed substantial control over them as well.   Both are therefore employers under the FLSA and New York Labor law.  The plaintiffs' motion for summary judgment on this issue is granted, and the defendants' motion to dismiss the claims against the individual defendants is denied.

## 8.    Motion for summary judgment of the first counterclaim against plaintiff Lapinski for conversion of a logbook

The defendants' first counterclaim alleges, in part, that plaintiff Lapinski converted a logbook that belonged to Capala Bros.   The logbook was used to record which workers had taken electric tools from the Capala Bros.' Greenpoint shop, and one of plaintiff Lapinksi's duties as an employee of Capala Bros. was to oversee the distribution of electric tools and to maintain the logbook.  The defendants claim that, after Lapinski left the company, the logbook disappeared along with some of the electric tools entrusted to him which were valued at $3000.  Suspecting that Lapinski absconded with the logbook, the defendants have brought this counterclaim against him for conversion of both the logbook and the tools.  The plaintiffs now argue that there is

30

insufficient evidence to suggest that Lapinski is or was in unauthorized possession of the logbook.

"The tort of conversion is established when one who owns and has the right to possession of personal property proves that the property is in the unauthorized possession of another who has acted to exclude the rights of the owner." Republic of Haiti v. Duvalier, 211 A.D.2d 379, 384 (N.Y. App. Div. 1995). Robert Capala has testified that the logbook went missing after Lapinski stopped working for Capala Bros. and that only he, his brother Piotr,[14] and Lapinski had keys to the tool room in which the logbook was kept. In his own defense, Lapinski testified that

> [a]lthough my job responsibilities while working for Defendants included keeping such a log, I left the log book at Defendants' premises a week before my employment with Defendants was terminated, when I took sick leave. I never removed the log book from Defendants' premises, nor am I aware of the current location of the log book.

Lapinski Declaration ¶ 12. The only evidence to support the defendants' claim is the speculative and self-serving testimony of Robert Capala, and such conclusory allegations are insufficient to create a genuine issue of fact. The plaintiffs' motion for summary judgment of the defendants' claim for conversion of the logbook is therefore granted.

## CONCLUSION

For the foregoing reasons, it is hereby ORDERED that

> (1) the defendants' motion for summary judgment of the plaintiffs' FLSA claims is DENIED;

> (2) the defendants' motion to deny certification of the class is DENIED;

---

[14] A third Capala brother, but one with no ownership interest in the Capala Bros. company and who is not named as a party in this action.

(3) the defendants' motion to dismiss the claim for attorney's fees pursuant to New York Labor Law § 198 is DENIED;

(4) the defendants' motion to strike the plaintiffs' reply and for a default judgment is DENIED;

(5) the defendants' motion for leave to amend the counterclaims to include a claim for indemnification and contribution liability against the foremen plaintiffs is DENIED;

(6) the defendants' motion to dismiss the causes of action against the individual defendants Robert and Pawel Capala on the basis that the complaint fails to state a claim against them on the theory of piercing the corporate veil is DENIED;

(7) the plaintiffs' motion for summary judgment that Robert and Pawel Capala are "employers" under the FLSA and New York Labor law is GRANTED; and

(8) the plaintiffs' motion for summary judgment dismissing the defendants' first counterclaim against plaintiff Lapinski for conversion of a logbook is GRANTED.

Additionally, the defendants' motion to amend the caption is GRANTED.  The defendants' motion to compel is DENIED as moot, and the defendants' motion to dismiss the minimum wage claims is GRANTED.

Dated:      Brooklyn, New York
            May 5, 2009


                                    _____/s/_____

                                    I. Leo Glasser
                                    United States Senior District Judge

**Copies of the foregoing memorandum and order were electronically sent to:**

<u>Counsel for Plaintiffs</u>:

Robert Wisniewski, Esq.
*Robert Wisniewski & Associates P.C.*
225 Broadway, Suite 612
New York, New York 10007


<u>Counsel for Defendants</u>:

Felipe E. Orner, Esq.
72-29 137th Street
Flushing, New York 11367